**TOSTRUD LAW GROUP, P.C.**
JON A. TOSTRUD
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Telephone: (310) 278-2600
Facsimile: (310) 278-2640
Email: jtostrud@tostrudlaw.com

**GAINEY McKENNA & EGLESTON**
THOMAS J. MCKENNA
GREGORY M. EGLESTON
440 Park Avenue South, 5th Floor
New York, New York 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS E. EMOND, Derivatively on Behalf of IZEA WORLDWIDE, INC., <br><br> Plaintiff, <br><br> v. <br><br> EDWARD H. MURPHY, RYAN S. SCHRAM, BRIAN W. BRADY, JOHN H. CARON, LINDSAY A. GARDNER, JILL M. GOLDER, and DANIEL R. RUA, <br><br> Defendants, <br><br> and, <br><br> IZEA WORLDWIDE, INC., <br><br> Nominal Defendant. | Case No.: 2:18-cv-9040 <br><br> <u>CLASS ACTION</u> <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br><br><br><br> <u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Dennis E. Emond ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Izea Worldwide, Inc. ("Izea" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint").  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Izea with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Izea against certain of its officers and directors seeking to remedy the Director Defendants' (as defined below) breach of fiduciary duties and gross mismanagement that occurred from May 15, 2015 through the present (the "Relevant Period") and caused substantial harm to Izea.

2.      As stated in its most recent Form 10-K, Izea creates and operates online marketplaces that connect marketers with content creators. The creators are compensated by Izea for producing unique content such as long and short form text, videos, photos, status updates, and illustrations for marketers or distributing such content on behalf of marketers through their personal websites, blogs, and social media channels. Its technology brings the marketers and creators together, enabling their transactions to be completed at scale through the management of custom content workflow, creator search and targeting, bidding, analytics and payment processing.

3.      As described in its Form 10-Q for the quarter ended March 31, 2015 (the "1Q 2015 10-Q"), historically Izea generated revenue from four sources:

- Sponsored Revenue - Revenue from an advertiser when it pays for a social media

publisher or influencer such as a blogger or tweeter ("creators") to share sponsored content with their social network audience,

- Content Revenue - Revenue when a publisher or company purchases custom branded content for use on its owned and operated sites, as well as third party content marketing and native advertising efforts,

- Media Revenue - Revenue from the posting of targeted display advertising ("Media Revenue"), and

- Service Fee Revenue - Revenue derived from various service and license fees charged to users of our platforms.

4.      In January 2015 Izea acquired Ebyline and its technology platform that was created to source and compensate creators specifically for the creation and delivery of professional editorial content.

5.      Prior to January 2017 and during the Relevant Period, in its public filings Izea described revenue from Ebyline as Content Revenue and further represented that it had a significant effect on Izea's overall gross profit percentage.

6.      On April 2, 2018, Izea issued a press release stating that there was an error in accounting for revenue and cost of sales related to the self-service Content Workflow portion of the company's revenue.   Izea acknowledged that historically it reported revenue from the company's Content Workflow services as the gross amounts billed to marketers for their transactions.   Izea now admits that this portion of the company's revenue should have been reported on a net transaction basis.

7.      On April 3, 2018, Izea stated that the Company's financial statements from 2015 onward should no longer be relied upon.  Izea also stated that the amount the Company previously

reported as gross profit on Content Workflow should be the amount reported as revenue. Izea further stated:

> Previously, Content Workflow revenue was reported as gross billings of approximately $6.9 million and $6.5 million in 2015 and 2016, respectively. Content Workflow revenue on a net transaction basis is expected to be restated as approximately $500,000 and $500,000 in 2015 and 2016, respectively.

8.      Throughout the Relevant Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Izea's accounting treatment of Content Workflow revenue on a gross basis was improper; (2) Izea's Content Workflow revenue should have been reported on a net transaction basis; and (3) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

9.      In response to the aforesaid materially false and misleading statements, a securities lawsuit, *Julian Perez v. IZEA, Inc., et al.*, case number 2:18-cv-02784-SVW-GJS was instituted in the U.S. District Court for the Central District of California against the Company and certain of its executive officers on behalf of certain purchasers of the Company's common stock, causing damage to the Company.

## JURISDICTION

10.      This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11.      Venue is proper in this Court because the Company maintains its executive office in this county, a substantial portion of the transactions and wrongs complained of herein occurred in this county, and the Individual Defendants have received substantial compensation in

1  this county by doing business here and engaging in numerous activities that had an effect in this

2  county.

3  **THE PARTIES**

4  **Plaintiff**

5

6     12.     ***Plaintiff Dennis E. Emond*** is, and was at relevant times, a shareholder of Izea.

7  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the

8  rights of the corporation. Plaintiff is a resident of the State of Texas.

9  **Nominal Defendant**

10

11     13.     ***Nominal Defendant Izea*** creates and operates online marketplaces that connect

12  marketers with content creators.  Izea is a Nevada Corporation with operations located in Los

13  Angeles, California.

14  **Director Defendants**

15     14.     ***Defendant Edward H. Murphy*** ("Murphy") is the Company founder and has

16  been a member of the Company's Board of Directors since 2006.  Murphy is also Izea's President

17  and Chief Executive Officer ("CEO").  Upon information and belief, Defendant Murphy is a

18

19  resident of the State of Florida.

20     15.     ***Defendant Ryan S. Schram*** ("Schram") has been a member of the Company's

21  Board since 2012, and is the Company's Chief Operating Officer ("COO").  Upon information

22

23  and belief, Defendant Schram is a resident of the State of Michigan.

24     16.     ***Defendant Brian W. Brady*** ("Brady") has been a member of the Company's

25  Board since 2012.  Brady is a member of the Nominating and Governance Committee.  Upon

26  information and belief, Defendant Brady is a resident of the State of Michigan.

27     17.     ***Defendant John H. Caron*** ("Caron") has been a member of the Company's

28

- 4 -

Board since 2015.  Caron is a member of the Audit Committee, Compensation Committee, and the Nominating and Governance Committee. Upon information and belief, Defendant Caron is a resident of the State of Florida.

18.      **Defendant Lindsay A. Gardner** ("Gardner") has been a member of the Company's Board since 2013.  Gardner is the Chair of the Compensation Committee and is a member of the Nominating and Governance Committee.  Upon information and belief, Defendant Gardner is a resident of the State of California.

19.      **Defendant Jill M. Golder** ("Golder") has been a member of the Company's Board since 2015.  Golder is the Chair of the Audit Committee and is a member of the Nominating and Governance Committee.  Upon information and belief, Defendant Golder is a resident of the State of Florida.

20.      **Defendant Daniel R. Rua** ("Rua") has been a member of the Company's Board since 2012.  Rua is a member of the Audit Committee, Compensation Committee, and the Nominating and Governance Committee.  Upon information and belief, Defendant Rua is a resident of the State of Florida.

21.      Defendants Murphy, Schram, Brady, Caron, Garner, Golder, and Rua are collectively referred to as the "Director Defendants".

<u>**IZEA'S CORPORATE GOVERNANCE**</u>

22.      As members of Izea's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies, and assuring the integrity of its financial and business records.

23.      The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Izea, the absence of

- 5 -

good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE DIRECTOR DEFENDANTS

24.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Izea, the Director Defendants owed Izea and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage Izea in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of Izea and its investors.

25.     Each director of the Company owes to Izea and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

26.     To discharge their duties, the officers and directors of Izea were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Izea were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how Izea conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

27.    Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Izea, the absence of good faith on their part, and a reckless

disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

28.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, Izea has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

**Background and Materially False and Misleading Statements**

29.     Izea creates and operates online marketplaces that connect marketers with content creators.  Izea works with marketers to enable influencer marketing campaigns at scale. The Company also works with marketers to augment or replace their content development efforts.

30.     Presently, Izea utilizes three platforms to meet its business objectives, as described in its Form 10-K filed with the SEC on April 4, 2018 (the "2017 10-K"):

- The Izea Exchange – "is designed to provide a unified ecosystem that enables the creation and publication of multiple types of custom content through our creator's personal websites, blogs, and social media channels including Twitter, Facebook, and Instagram, among others. We extensively use this platform to manage Sponsored Social campaigns on behalf of our marketers. This platform is also available directly to our marketers as a self-service tool and as a licensed white label."

- Ebyline – "In January 2015, we acquired Ebyline and its technology platform that was created to source and compensate creators specifically for the creation and delivery of professional editorial content."

- ZenContent – "In July 2016, we acquired ZenContent including its custom content

creation workflow technology and database of creators. ZenContent's platform enables us to produce highly scalable, multi-part production of content for both e-commerce entities, as well as brand customers."

31.     Izea derives revenue from managing content services or advertising campaigns for its customers, as well as from making its platforms available to allow customers the ability to purchase content directly from its creators. Per its 2017 10-K, Izea now categorizes its revenue by three primary revenue streams:

- Managed Services - Revenue from its managed services when a marketer (typically a brand, agency or partner) pays Izea to provide custom content, influencer marketing or amplification services,

- Content Workflow - Revenue from transactions generated by the self-service use of Izea's platforms by marketers to handle their content workflow from initial content request to payment of content received or distributed, and

- Service Fee Revenue - Revenue derived from various service and license fees charged to users of Izea's platforms.

In earlier public filings, Izea categorized its revenue differently (See ¶ 34, supra).

32.     Izea has classified the self-service Content Workflow portion of its revenue in different ways throughout the Relevant Period:

- Prior to January 2017, the Company stated that revenue from the Ebyline acquisition was classified as "Content Revenue."

- Beginning in January 2017, the Company had a specific category entitled "Content Workflow" revenue. The Company defined this as revenue from the self-service use of the Company's Ebyline platform by news agencies to handle their content

workflow from initial content request to payment of content received.

33.     On May 14, 2015, the Company filed a Form 10-Q for the quarter ended March 31, 2015 (the "1Q 2015 10-Q") with the SEC, which provided the Company's first quarter 2015 financial results and position. The 1Q 2015 10-Q was signed by Defendant Murphy and LeAnn Hitchcock ("Hitchcock"), Izea's Chief Financial Officer ("CFO"), who resigned from Izea effective August 15, 2018. The 1Q 2015 10-Q stated that the Company's disclosure controls and procedures were effective as of March 31, 2015.

34.     The 1Q 2015 10-Q contained certifications pursuant to the Sarbanes- Oxley Act of 2002 ("SOX") signed by Defendant Murphy and Hitchcock attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

35.     The 1Q 2015 10-Q discussed the Company's revenue, cost of sales and gross profit margin:

**Revenues**

We derive revenue from four sources: revenue from an advertiser when it pays for a social media publisher or influencer such as a blogger or tweeter ("creators") to share sponsored content with their social network audience ("Sponsored Revenue"), revenue when a publisher or company purchases custom branded content for use on its owned and operated sites, as well as third party content marketing and native advertising efforts ("Content Revenue"), revenue from the posting of targeted display advertising ("Media Revenue") and revenue derived from various service and license fees charged to users of our platforms ("Service Fee Revenue").

36.     In its 1Q 2015 10-Q Izea also discussed cost of sales and that its gross profit was growing as compared to the same quarter in 2014:

**Cost of Sales and Gross Profit**

Our cost of sales is comprised primarily of amounts paid to our content creators for fulfilling a customer's request for content or advertising services to push that

content through a blog post, tweet, click or action.

Cost of sales for the three months ended March 31, 2015 increased by $1,791,958, or 275.9%, compared to the same period in 2014. The increase in cost of sales was primarily related to the increase in our sales and higher cost of those sales due to the acquisition of Ebyline in January 2015.

***Gross profit for the three months ended March 31, 2015 increased by $386,496, or 29.6%, compared to the same period in 2014***. Our gross profit as a percentage of revenue decreased from 67% for the three months ended March 31, 2014 to 41% for the same period in 2015. The gross profit decrease during the three months ended March 31, 2015 compared to 2014 was primarily attributable to substantially lower profit margins on Content Revenue that was added to our product mix during the three months ended March 31, 2015, as well as increased participation by IZEAx partners.

The acquisition of Ebyline in January 2015 that currently generates Content Revenue at a gross profit of 10% on 33% of our total revenue has a significant affect on our overall gross profit percentage. Additionally, the addition of white label partners to IZEAx translates into lower margins on our Sponsored Revenue. White label partners receive a percentage of each transaction generated by users within their system. As a result, we expect that our total revenue will increase but our margins will decrease to an expected range of 30%-35%. [Emphasis added]

37.     On August 12, 2015, the Company filed a Form 10-Q for the quarter ended June 30, 2015 (the "2Q 2015 10-Q") with the SEC, which provided the Company's second quarter 2015 financial results and position. The 2Q 2015 10-Q was signed by Defendant Murphy and Hitchcock. The 2Q 2015 10-Q stated that the Company's disclosure controls and procedures were effective as of June 30, 2015.

38.     The 2Q 2015 10-Q contained signed SOX certifications by Defendant Murphy and Hitchcock attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

39.     The 2Q 2015 10-Q discussed the Company's revenue, cost of sales and gross profit margin.  Regarding its cost of sales and gross profit, the Company stated that its gross profit

was growing as compared to the same quarter in 2014, and that its self-service workflow Content Revenue stream had a significant effect on the Company's gross profit percentage:

**Cost of Sales and Gross Profit**

Our cost of sales is comprised primarily of amounts paid to our content creators for fulfilling a customer's request for content or advertising services to push that content through a blog post, tweet, click or action.

Cost of sales for the three months ended June 30, 2015 increased by $2,260,704, or 344%, compared to the same period in 2014. The increase in cost of sales was primarily related to the increase in our sales and higher cost on 47% of those sales related to Content Revenue.

***Gross profit for the three months ended June 30, 2015 increased by $397,803, or 30%, compared to the same period in 2014.*** Our gross profit as a percentage of revenue decreased from 67% for the three months ended June 30, 2014 to 37% for the same period in 2015. The gross profit decrease during the three months ended June 30, 2015 compared to 2014 was primarily attributable to substantially lower profit margins on Content Revenue that was added to our product mix during the three months ended June 30, 2015.

***During the three months ended June 30, 2015, we generated a gross profit of 11% on 47% of our total revenue related to sales of Content. Prior to being acquired by IZEA, Ebyline generated Content Revenue primarily from newspaper and traditional publishers through their workflow platform on a self-service basis at a 7%-9% profit. After the acquisition, these customers still produce a significant amount of revenue, but we are increasing the sales of Content to brands on a managed basis and expect to see continued improvement in the Content margins. The mix of sales between our higher margin Sponsored Revenue and our lower margin Content Revenue (particularly the self-service workflow portion of this revenue) has a significant affect on our overall gross profit percentage.*** As a result, we expect that our total revenue will increase but our margins will decrease to an expected range of 30%-35%.  [Emphasis added]

40.    On November 16, 2015, the Company filed a Form 10-Q for the quarter ended September 30, 2015 (the "3Q 2015 10-Q") with the SEC, which provided the Company's third quarter 2015 financial results and position. The 3Q 2015 10-Q was signed by Defendant Murphy and Hitchcock. The 3Q 2015 10-Q stated that the Company's disclosure controls and procedures were effective as of September 30, 2015.

41.    The 3Q 2015 10-Q contained signed SOX certifications by Defendant Murphy and Hitchcock attesting to the accuracy of financial reporting, the disclosure of any material

changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

42.     The 3Q 2015 10-Q discussed the Company's revenue, cost of sales and gross profit margin. Regarding its cost of sales and gross profit, the Company stated that its gross profit was growing as compared to the same quarter in 2014, and that its self-service workflow Content Revenue stream had a significant effect on the Company's gross profit percentage:

**Cost of Sales and Gross Profit**

Our cost of sales is comprised primarily of amounts paid to our content creators to provide content or advertising services through the pushing of sponsored content through a blog post, tweet, click or action.

Cost of sales for the three months ended September 30, 2015 increased by $2,598,240, or 375%, compared to the same period in 2014. The increase in cost of sales was primarily related to the increase in our sales and higher cost on 40% of those sales related to Content Revenue.

***Gross profit for the three months ended September 30, 2015 increased by $912,546, or 74%, compared to the same period in 2014.*** Our gross profit as a percentage of revenue decreased from 64% for the three months ended September 30, 2014 to 40% for the same period in 2015. The gross profit decrease during the three months ended September 30, 2015 compared to 2014 was primarily attributable to substantially lower profit margins on Content Revenue that was added to our product mix during the three months ended September 30, 2015.

***During the three months ended September 30, 2015, we generated a gross profit of 11% on 40% of our total revenue related to sales of Content. Prior to being acquired by IZEA, Ebyline generated Content Revenue primarily from newspaper and traditional publishers through their workflow platform on a self-service basis at a 7%-9% profit. After the acquisition, these customers still produce a significant amount of revenue, but we are increasing the sales of Content to customers on a managed basis and expect to see continued improvement in the Content margins. The mix of sales between our higher margin Sponsored Revenue and our lower margin Content Revenue (particularly the self-service workflow portion of this revenue) has a significant affect on our overall gross profit percentage.*** As a result of the changes in our sales mix, we expect that our total revenue will increase but our margins will decrease to an expected range of 35%-40%.  [Emphasis added]

43.     On March 30, 2016, the Company filed its annual report for the fiscal year ended

December 31, 2015 on Form 10-K (the "2015 10-K") with the SEC, which provided the Company's annual financial results and position. The 2015 10-K was signed by Defendant Murphy and Hitchcock. The 2015 10-K also contained signed SOX certifications by Defendant Murphy and Hitchcock attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

44.     The 2015 10-K discussed the Company's revenue, cost of sales and gross profit margin.  Regarding its cost of sales and gross profit, the Company stated that its gross profit was growing as compared to the same period in 2014, and that its self-service workflow Content Revenue stream had a significant effect on the Company's gross profit percentage:

**Cost of Sales and Gross Profit**

Our cost of sales is comprised primarily of amounts paid to our content creators to provide content or advertising services through the pushing of sponsored content through a blog post, tweet, click or action.

Cost of sales for the twelve months ended December 31, 2015 increased by $9,391,083, or 330.0%, compared to the same period in 2014. The increase in cost of sales was primarily related to the increase in our sales and higher cost on 39% of those sales related to Content Revenue.

***Gross profit for the twelve months ended December 31, 2015 increased by $2,754,569, or 50.3%, compared to the same period in 2014***. Our gross profit as a percentage of revenue decreased from 66% for the twelve months ended December 31, 2014 to 40% for the same period in 2015. The gross profit decrease during the twelve months ended December 31, 2015 compared to 2014 was primarily attributable to substantially lower profit margins on Content Revenue that was added to our product mix during the twelve months ended December 31, 2015.

***During the twelve months ended December 31, 2015, we generated a gross profit of 12% on 39% of our total revenue related to sales of Content. Prior to being acquired by IZEA, Ebyline generated Content Revenue primarily from newspaper and traditional publishers through their workflow platform on a self-service basis at a 7% to 9% profit. After the acquisition, these customers still produce a significant amount of revenue, but we are increasing the sales of Content to customers on a managed basis and expect to see continued***

*improvement in the Content margins. The mix of sales between our higher margin Sponsored Revenue and our lower margin Content Revenue (particularly the self-service workflow portion of this revenue) has a significant affect on our overall gross profit percentage*. As a result of the changes in our sales mix, we expect that our margins will average 38% to 41% in future years.   [Emphasis added]

45.     On May 11, 2016, the Company filed a Form 10-Q for the quarter ended March 31, 2016 (the "1Q 2016 10-Q") with the SEC, which provided the Company's first quarter 2016 financial results and position. The 1Q 2016 10-Q was signed by Defendant Murphy and Hitchcock. The 1Q 2016 10-Q stated that the Company's disclosure controls and procedures were effective as of March 31, 2016.

46.     The 1Q 2016 10-Q contained signed SOX certifications by Defendant Murphy and Hitchcock attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

47.     The 1Q 2016 10-Q discussed the Company's revenue, cost of sales and gross profit margin.  Regarding its cost of sales and gross profit, the Company stated that its gross profit was growing as compared to the same quarter in 2015, and that its self-service workflow Content Revenue stream had a significant effect on the Company's gross profit percentage:

**Cost of Sales and Gross Profit**

Our cost of sales is comprised primarily of amounts paid to our content creators to provide content or advertising services through the pushing of sponsored content through a blog post, tweet, click or action.

Cost of sales for the three months ended March 31, 2016 increased by $659,878, or 27.0%, compared to the same period in 2015. The increase in cost of sales proportionally increased primarily due to the increase in our sales.

*Gross profit for the three months ended March 31, 2016 increased by $670,578, or 39.6%, compared to the same period in 2015*. Our gross profit as a percentage of revenue increased from 41% for the three months ended March 31, 2015 to 43%

for the same period in 2016. Sponsored Revenue gross margin was 62% and Content Revenue was 19% for the three months ended March 31, 2016.

*The gross profit increase was primarily attributable to increased use of our managed services versus self-service content and sponsored social offerings. Prior to being acquired by IZEA, Ebyline generated Content Revenue primarily from newspaper and traditional publishers through their workflow platform on a self-service basis at a 7% to 9% profit. After the acquisition, these customers still produce a significant amount of revenue, but we are increasing the sales of Content Revenue to customers on a managed basis and expect to see continued improvement in the Content Revenue margins. The mix of sales between our higher margin Sponsored Revenue and our lower margin Content Revenue (particularly the self-service workflow portion of this revenue) has a significant affect on our overall gross profit percentage.*

For the three months ended March 31, 2016, managed services were 31.5% of Content Revenue compared to 9.0% for the three months ended March 31, 2015. Additionally, the margins on the managed portion of Content Revenue increased by twelve percentage points for the three months ended March 31, 2016 as we incorporated our standard pricing guidelines into new bookings that were closed in fourth quarter of fiscal 2015.  [Emphasis added]

48.      On August 11, 2016, the Company filed a Form 10-Q for the quarter ended June 30, 2016 (the "2Q 2016 10-Q") with the SEC, which provided the Company's second quarter 2016 financial results and position. The 2Q 2016 10-Q was signed by Defendant Murphy and Hitchcock. The 2Q 2016 10-Q stated that the Company's disclosure controls and procedures were effective as of June 30, 2016.

49.      The 2Q 2016 10-Q contained signed SOX certifications by Defendant Murphy and Hitchcock attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

50.      The 2Q 2016 10-Q discussed the Company's revenue, cost of sales and gross profit margin.  Regarding its cost of sales and gross profit, the Company stated that its gross profit was growing as compared to the same quarter in 2015, and that its self-service workflow Content

Revenue stream had a significant effect on the Company's gross profit percentage:

**Cost of Sales and Gross Profit**

Our cost of sales is comprised primarily of amounts paid to our content creators to provide content or advertising services through the pushing of sponsored content through a blog post, tweet, click or action.

Cost of sales for the three months ended June 30, 2016 increased by $501,027, or 17%, compared to the same period in 2015. Cost of sales increased primarily due to the increase in our sales, but it was tempered by the improved margins on our managed services.

***Gross profit for the three months ended June 30, 2016 increased by $1,784,920, or 104%, compared to the same period in 2015***. Our gross profit as a percentage of revenue increased from 37% for the three months ended June 30, 2015 to 51% for the same period in 2016. Sponsored Revenue gross margin was 63% and Content Revenue gross margin was 24% for the three months ended June 30, 2016.

***The gross profit increase was primarily attributable to increased use of our managed services versus self-service content and sponsored social offerings. Prior to being acquired by IZEA, Ebyline generated Content Revenue primarily from newspaper and traditional publishers through their workflow platform on a self-service basis at a 7% to 9% profit. After the acquisition, these customers still produce a significant amount of revenue, but we are increasing the sales of Content Revenue to customers on a managed basis and expect to see continued improvement in the Content Revenue margins. The mix of sales between our higher margin Sponsored Revenue and our lower margin Content Revenue (particularly the self-service workflow portion of this revenue) has a significant effect on our overall gross profit percentage***. [Emphasis added]

\*       \*       \*

51.     On November 14, 2016, the Company filed a Form 10-Q for the quarter ended September 30, 2016 (the "3Q 2016 10-Q") with the SEC, which provided the Company's third quarter 2016 financial results and position. The 3Q 2016 10-Q was signed by Defendant Murphy and Hitchcock. The 3Q 2016 10-Q stated that the Company's disclosure controls and procedures were effective as of September 30, 2016.

52.     The 3Q 2016 10-Q contained signed SOX certifications by Defendant Murphy and Hitchcock attesting to the accuracy of financial reporting, the disclosure of any material

changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

53.      The 3Q 2016 10-Q discussed the Company's revenue, cost of sales and gross profit margin.  Regarding its cost of sales and gross profit, the Company stated that its gross profit was growing as compared to the same quarter in 2015, and that its self-service workflow Content Revenue stream had a significant effect on the Company's gross profit percentage:

**Cost of Sales and Gross Profit**

Our cost of sales is comprised primarily of amounts paid to our content creators to provide content or advertising services through the promotion of sponsored content in a blog post, tweet, click or action.

Cost of sales for the three months ended September 30, 2016 increased by $636,822, or 19%, compared to the same period in 2015. Cost of sales increased primarily due to the increase in our sales, but it was tempered by the improved margins on our managed services.

***Gross profit for the three months ended September 30, 2016 increased by $1,417,693, or 66%, compared to the same period in 2015***. Our gross profit as a percentage of revenue increased from 40% for the three months ended September 30, 2015 to 48% for the same period in 2016. Sponsored Revenue gross margin was 60% and Content Revenue gross margin was 26% for the three months ended September 30, 2016.

***The gross profit increase was primarily attributable to increased use of our managed services versus self-service content and sponsored social offerings. Prior to being acquired by IZEA, Ebyline generated Content Revenue primarily from newspaper and traditional publishers through their workflow platform on a self-service basis at a 7% to 9% profit. After the acquisition, these customers still produce a significant amount of revenue, but we are increasing the sales of Content Revenue to customers on a managed basis and expect to see continued improvement in the Content Revenue margins. The mix of sales between our higher margin Sponsored Revenue and our lower margin Content Revenue (particularly the self-service workflow portion of this revenue) has a significant effect on our overall gross profit percentage***.  [Emphasis added]

\*      \*      \*

54.      On March 28, 2017, the Company filed its annual report for the fiscal year ended December 31, 2016 on Form 10-K (the "2016 10-K") with the SEC, which provided the

Company's annual financial results and position. The 2016 10-K was signed by Defendant Murphy and Hitchcock. The 2016 10-K also contained signed SOX certifications by Defendant Murphy and Hitchcock attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

55.      The 2016 10-K discussed the Company's revenue, cost of sales and gross profit margin.  Regarding its cost of sales and gross profit, the Company stated that its gross profit was growing as compared to the same period in 2015, and that its self-service workflow Content Revenue stream had a significant effect on the Company's gross profit percentage:

**Cost of Sales and Gross Profit**

Our cost of sales is comprised primarily of amounts paid to our content creators to provide custom content or advertising services through the promotion of sponsored content in a blog post, tweet, click or action.

Cost of sales for the twelve months ended December 31, 2016 increased by $2,005,328, or 16%, compared to the same period in 2015. Cost of sales increased primarily due to the increase in our sales, but the increase was tempered by the improved margins on our managed services for Content Revenue.

***Gross profit for the twelve months ended December 31, 2016 increased by $4,837,348, or 59%, compared to the same period in 2015***. Our gross profit as a percentage of revenue increased from 40% for the twelve months ended December 31, 2015 to 48% for the same period in 2016. Sponsored Revenue gross margin was 61% and Content Revenue gross margin was 25% for the twelve months ended December 31, 2016. We estimate that our average gross margins for the year ending December 31, 2017 will average approximately 47% to 48%.

***The gross profit increase was primarily attributable to increased use of our managed services by marketers and agencies. Prior to being acquired by IZEA, Ebyline generated Content Revenue primarily from newspaper and traditional publishers through their workflow platform on a self-service basis at a 7% to 9% profit. After the acquisition, these customers still produce a significant amount of revenue, but we are increasing the sales of Content Revenue to customers on a managed basis and expect to see continued improvement in the Content Revenue margins. The mix of sales between our higher margin Sponsored Revenue and our lower margin Content Revenue (particularly the self-service workflow***

***portion of this revenue) has a significant effect on our overall gross profit percentage***. [Emphasis added]

*       *       *

56.     On May 10, 2017, the Company filed a Form 10-Q for the quarter ended March 31, 2017 (the "1Q 2017 10-Q") with the SEC, which provided the Company's first quarter 2017 financial results and position. The 1Q 2017 10-Q was signed by Defendant Murphy and Hitchcock. The 1Q 2017 10-Q stated that the Company's disclosure controls and procedures were effective as of March 31, 2017.

57.     The 1Q 2017 10-Q contained signed SOX certifications by Defendant Murphy and Hitchcock attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

58.     The 1Q 2017 10-Q discussed the Company's revenue, cost of sales and gross profit margin.  Regarding its cost of sales and gross profit, the Company stated that its gross profit was growing as compared to the same quarter in 2016:

**Cost of Sales and Gross Profit**

Our cost of sales is comprised primarily of amounts paid to our content creators to provide custom content or advertising services through the promotion or amplification of sponsored content in a blog post, tweet, click or action.

Cost of sales for the three months ended March 31, 2017 increased by $94,157, or 3%, compared to the same period in 2016. Cost of sales increased primarily due to the increase in our sales, but the increase was tempered by the improved margins on our Managed Services of custom content due to lower production costs after the acquisition of ZenContent in July 2016.

***Gross profit for the three months ended March 31, 2017 increased by $642,399, or 27%, compared to the same period in 2016***. Our gross profit as a percentage of revenue increased from 43% for the three months ended March 31, 2016 to 48% for the same period in 2017. The gross margin on our Managed Services for influencer marketing or custom content services was 61%, while the gross margin on Content Workflow was 7% for the three months ended March 31, 2017. Prior to being

- 20 -

acquired by IZEA in 2015, Ebyline generated revenue primarily from newspaper and traditional publishers through their workflow platform on a self-service basis at a fixed 7% to 9% profit. We do not actively sell or market Content Workflow to new customers due to the low margins and challenges facing the newspaper industry. After the acquisition, this revenue stream still contributes a significant portion of our revenue, but we utilize the content creators to promote the sale of custom content to our marketers on a managed basis. These services are sold at comparable margins to our influencer marketing services as we incorporated standard pricing guidelines during 2016.

The total gross profit increase was primarily attributable to the increase in revenue from our higher margin Managed Services versus reduced revenue from our lower margin Content Workflow. The mix of sales between our higher margin Managed Services and lower margin Content Workflow has a significant effect on our overall gross profit percentage.  [Emphasis added]

59.    On August 10, 2017, the Company filed a Form 10-Q for the quarter ended June 30, 2017 (the "2Q 2017 10-Q") with the SEC, which provided the Company's second quarter 2017 financial results and position. The 2Q 2017 10-Q was signed by Defendant Murphy and Hitchcock. The 2Q 2017 10-Q stated that the Company's disclosure controls and procedures were effective as of June 30, 2017.

60.    The 2Q 2017 10-Q contained signed SOX certifications by Defendant Murphy and Hitchcock attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

61.    The 2Q 2017 10-Q discussed the Company's revenue, cost of sales and gross profit margin.  Regarding its cost of sales and gross profit, the Company stated that its gross profit was growing as compared to the same quarter in 2016:

**Cost of Sales and Gross Profit**

Our cost of sales is comprised primarily of amounts paid to our content creators to provide custom content or advertising services through the promotion or amplification of sponsored content in a blog post, tweet, click or action.

Cost of sales for the three months ended June 30, 2017 increased by $23,794, or 1%, compared to the same period in 2016. Cost of sales increased proportionally with the increase in our sales.

***Gross profit for the three months ended June 30, 2017 increased by $42,738, or 1%, compared to the same period in 2016.*** Our gross profit percentage was nearly the same in the three months ended June 30, 2017 compared to the same period in 2016. We are now consistently selling all of our managed custom content services at similar margins to our historical Managed Sponsored Revenue margins. Content Workflow gross margin was consistent at 7% for the three months ended June 30, 2017 and 2016.

The total gross profit increase was primarily attributable to the increase in revenue and contribution margin from our higher margin, Managed Services offset by reduced revenue from our lower margin, Content Workflow. Managed Services contributed approximately 97% to the gross profit during the three months ended June 30, 2017 compared to 94% during the three months ended June 30, 2016. The mix of sales between our higher margin, Managed Services and lower margin, Content Workflow has a significant effect on our overall gross profit percentage. [Emphasis added]

62.     On November 7, 2017, the Company filed a Form 10-Q for the quarter ended September 30, 2017 (the "3Q 2017 10-Q") with the SEC, which provided the Company's third quarter 2017 financial results and position. The 3Q 2017 10-Q was signed by Defendant Murphy and Hitchcock. The 3Q 2017 10-Q stated that the Company's disclosure controls and procedures were effective as of September 30, 2017.

63.     The 3Q 2017 10-Q contained signed SOX certifications by Defendant Murphy and Hitchcock attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

64.     The 2Q 2017 10-Q discussed the Company's revenue, cost of sales and gross profit margin. Regarding its cost of sales and gross profit, the Company stated that its gross profit was growing as compared to the same quarter in 2016:

**Cost of Sales and Gross Profit**

Our cost of sales is comprised primarily of amounts paid to our content creators to provide custom content or advertising services through the promotion or amplification of sponsored content in a blog post, tweet, click or action.

Cost of sales for the three months ended September 30, 2017 decreased by $168,658, or approximately 4%, compared to the same period in 2016. Cost of sales decreased overall due to the decrease in Content Workflow. However, this decrease was tempered by the increase in costs on Managed Services as a result of the higher revenues generated during the quarter.

***Gross profit for the three months ended September 30, 2017 increased by $826,360, or approximately 23%, compared to the same period in 2016***. Our gross profit percentage increased nearly 600 basis points in the three months ended September 30, 2017 compared to the same period in 2016. This increase is a result of the increased margins we are receiving on our managed customer content services in 2017. Content Workflow gross margin was consistent at 7% for the three months ended September 30, 2017 and 2016.

The total gross profit increase was primarily attributable to the increase in revenue and contribution margin from our higher margin, Managed Services offset by reduced revenue from our lower margin, Content Workflow. Managed Services contributed approximately 98% to the gross profit during the three months ended September 30, 2017 compared to 95% during the three months ended September 30, 2016. The mix of sales between our higher margin, Managed Services and lower margin, Content Workflow has a significant effect on our overall gross profit percentage.  [Emphasis added]

## THE TRUTH EMERGES

65.     On April 2, 2018, the Company issued a press release entitled, "IZEA Postpones Announcement of Fourth Quarter and Full Year 2017 Earnings," stating the amount the Company previously reported as gross profit from Content Workflow should be the amount reported as revenue. The press release states, in relevant part:

**ORLANDO, FL (April 2, 2018)** – IZEA, Inc. (NASDAQ: IZEA), today announced that it will reschedule its earnings release and conference call to discuss its fourth quarter and full year 2017 financial results which was previously scheduled for Monday, April 2, 2018.

The company is in the process of working with its independent accounting firm to finalize its financial statements for fourth quarter and full year 2017.

In connection with the preparation of the company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017, the company's Audit Committee of the Board of Directors (the "Audit Committee") determined that there was an error in accounting for revenue and cost of sales related to the self-service Content Workflow portion of the company's revenue. Historically, the company has reported revenue from the company's Content Workflow services as the gross amounts billed to marketers for their transactions. Upon further review, the Audit Committee determined that this portion of the company's revenue should have been reported on a net transaction basis. Therefore, the amount that the company previously reported as the gross profit on Content Workflow should be the amount reported as revenue.

As a result of additional review procedures necessitated by the accounting adjustments, the company needs additional time to file its Annual Report on Form 10-K for the year ended December 31, 2017 and plans to file a request for an extension on Form 12b-25 with the Securities and Exchange Commission.

IZEA will release its fourth quarter and full year 2017 financial results as soon as practicable. Management will provide updates on the timing of the earnings call as appropriate.

66.     On this news, the stock price of IZEA fell $0.66 per share or over 18% to close at $3.00 per share on April 2, 2018.

67.     On April 3, 2018, Izea filed a Form 8-K with the SEC stating the Company's financial statements from 2015 onward should no longer be relied upon.  It also stated that the amount the Company previously reported as gross profit on Content Workflow should be the amount reported as revenue. The Form 8-K states, in relevant part:

On March 31, 2018, the Company's Audit Committee of the Board of Directors (the "Audit Committee") concluded that the Company's previously issued financial statements included in its Annual Reports on Form 10-K for the years ended December 31, 2015 and 2016 and Quarterly Reports on Form 10-Q for each quarter for the years ended December 31, 2015 and 2016, and the first three quarters for year ended December 31, 2017 (collectively, the "Restated Periods") should no longer be relied upon.

In connection with the preparation of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017, the Audit Committee determined that there was an error in accounting for revenue and cost of sales related to the self-service Content Workflow portion of the Company's revenue. Historically, the Company has reported revenue from the Company's Content Workflow services as

the gross amounts billed to marketers for their transactions. Upon recommendation from the Company's management and further consideration, the Audit Committee determined that this portion of the Company's revenue should have been reported on a net transaction basis. Therefore, the amount that the Company previously reported as the gross profit on Content Workflow should be the amount reported as revenue. Previously, Content Workflow revenue was reported as gross billings of approximately $6.9 million and $6.5 million in 2015 and 2016, respectively. Content Workflow revenue on a net transaction basis is expected to be restated as approximately $500,000 and $500,000 in 2015 and 2016, respectively. The Company expects the Content Workflow revenue for 2017, as calculated on a net transaction basis, will be consistent with the trends disclosed with respect to gross profit on Content Workflow in the first three quarters of 2017.

The Company is working toward filing its restated financial statements as soon as practicable. At this time, however, the Company cannot predict with certainty when the preparation of those prior period restated financial statements will be completed. Additionally, the Company can provide no assurance at this time that the restated consolidated financial statements will not reflect additional accounting adjustments that arise as a result of the efforts described above.

68.     On this news, the stock price of IZEA fell $0.58 per share or over 19% to close at $2.42 per share on April 3, 2018.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

69.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

70.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

71.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

72.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

73.     The Company Board is currently comprised of seven (7) members – Defendants Murphy, Schram, Brady, Caron, Garner, Golder, and Rua.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, four (4), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

74.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

75.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

76.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

77.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are

principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

78.      Because of his participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Murphy is unable to comply with his fiduciary duties and prosecute this action.  He is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

79.      Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**The Director Defendants Are Not Independent or Disinterested**

**Defendant Murphy**

80.      Defendant Murphy is not disinterested or independent, and therefore, is incapable of considering demand because he (as its president and CEO) is an employee of the Company who derives substantially all of his income from his employment with Izea, making him not independent.  As such, Defendant Murphy cannot independently consider any demand to sue himself for breaching his fiduciary duties to Izea, because that would expose him to liability and threaten his livelihood.

81.      Additionally, Izea acknowledged that Murphy is not independent in its Form DEF 14A filed with the SEC on October 10, 2018.

82.      Because of his participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Murphy is unable to comply with his fiduciary duties and prosecute this action.  He is in a position of irreconcilable conflict of

interest in terms of the prosecution of this action and defending himself in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

**Defendant Schram**

83. Defendant Schram is not disinterested or independent, and therefore, is incapable of considering demand because he (as its COO) is an employee of the Company who derives substantially all of his income from his employment with Izea, making him not independent. As such, Defendant Murphy cannot independently consider any demand to sue himself for breaching his fiduciary duties to Izea, because that would expose him to liability and threaten his livelihood.

84. Additionally, Izea acknowledged that Murphy is not independent in its Form DEF 14A filed with the SEC on October 10, 2018.

**Defendants Caron, Golder, and Rua**

85. During the Relevant Period, Defendants Caron, Golder, and Rua served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein

86. Defendants Caron, Golder, and Rua breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants

Caron, Golder, and Rua face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## FIRST CAUSE OF ACTION

### Against The Director Defendants for Breach of Fiduciary Duties

87.     Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

88.     The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

89.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

90.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

91.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

92.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending

securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### Against The Director Defendants for Gross Mismanagement

93.     Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

94.     By their actions alleged herein, the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

95.     As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

96.     Because of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to the Company.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.     Directing the Company to take all necessary actions to reform and improve

its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

        D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

        E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  October 19, 2018

By: /s/ Jon A. Tostrud
      Jon A. Tostrud, Esq.
**TOSTRUD LAW GROUP, P.C.**
1925 Century Park East, Ste. 2100
Los Angeles, CA. 90067
Telephone: (310) 278-2600
Facsimile: (310) 278-2640
Email: jtostrud@tostrudlaw.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***

## <u>VERIFICATION</u>

I, Dennis E. Emond, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Izea Worldwide, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Izea Worldwide, Inc. common stock at all relevant times.

17 OCT 2018
Date

Dennis E. Emond